**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RONALD RAY CORBIN,** | |
| **Plaintiff,** | **No. 11 C 3361** |
| **v.** | |
| **CAROLYN W. COLVIN, Acting** | **Magistrate Judge Mary M. Rowland** |
| **Commissioner of Social Security,**[1] | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Ray Corbin filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d).

2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in 2006, alleging that he became disabled on March 23, 2002, because of problems related to several knee procedures.[3] (R. at 14, 67, 122, 183). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 14, 67–72, 77–80, 82). On March 24, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 14, 29–66). The ALJ also heard testimony from Michael C. McClanahan, Ph.D., a vocational expert (VE). (*Id.* at 14, 29–66, 121).

The ALJ denied Plaintiff's request for benefits on June 17, 2009. (R. at 14–22). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from March 23, 2002, the alleged onset date, through December 31, 2003, his date last insured.[4] (*Id.* at 16). At step two, the ALJ found that Plaintiff's arthritis of the left knee and status post total left knee replacement are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 17).

---

[3] It is not clear from the record whether Plaintiff applied in March or September 2006. (*Compare* R. at 67–68 *with id.* at 125). During the same time period, Plaintiff also applied for SSI (*id.* at 122), but apparently did not pursue it (Mot. 2).

[4] The ALJ determined that Plaintiff last met the Act's insured status requirements on December 31, 2003. (R. at 16). "In order to be entitled to DIB, an individual must establish that the disability arose while he or she was insured for benefits." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 348 (7th Cir. 2005). Therefore, in order to recover for benefits, Plaintiff must establish that he was disabled prior to December 31, 2003. *See Bjornson v. Astrue,* 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [his last insured] date is [he] eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[5] and determined that he could perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that Plaintiff could

> occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds; push and/or pull within the limits given for lifting and carrying; he could stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday; he could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. [Plaintiff] could only occasionally climb ramps and stairs and kneel and he could never climb ladder/rope/scaffolds [sic] or crawl; [Plaintiff] needed crutches to ambulate.

(R. at 17) (citations omitted). Based on Plaintiff's RFC, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (*Id.* at 20). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as a food and beverage order clerk. (*Id.* at 21). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 22).

The Appeals Council denied Plaintiff's request for review on March 24, 2011. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent mean-

ingful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

As a result of a work-related injury on March 23, 2002, Plaintiff underwent left knee anterior cruciate reconstruction surgery and medial and lateral arthroscopic meniscectomies. (R. at 219–21). Post-surgery, Plaintiff complained of pain and presented with reduced range of motion and poor gait mechanics. (*Id.* at 208).

On October 7, 2002, Mitchell I. Krieger, M.D., examined Plaintiff on behalf of Zurich Insurance. (R. at 1071–72). Plaintiff was able to flex his knee through 130 degrees and had full extension, but he complained of pain.[6] (*Id.* at 1072). Dr. Krieger opined that Plaintiff was unable to work because he needed either one or two crutches to ambulate. (*Id.*).

On July 15, 2003, Plaintiff underwent a left total knee arthroplasty and manipulation. (R. at 257, 259). Post-surgery imaging tests indicated that Plaintiff's knee was in good position and alignment. (*Id.* at 263). His range of motion in the left knee was limited to 115 degrees. (*Id.* at 262). On August 13, 2003, Plaintiff was able to ambulate without assistive devices, although he was lacking full heel strike and his knee extension was limited to 15 degrees. (*Id.* at 254). With physical therapy, his range of motion and gait improved. (*Id.* at 251). He was discharged from physi-

---

[6] While a knee can fully flex up to 140 degrees, only 60–70 degrees of flexion are needed for normal walking and about 90 degrees to be able to rise from a seated position. *See* Brianne Grogan, *What Is the Normal Range of Motion of the Knee?,* available at <www.livestrong.com>; Frank R. Noyes, M.D., *The Knee—Range of Motion,* available at <www.kneeguru.co.uk>

cal therapy on August 6, 2003, after his goals were met and his condition reported as "good." (*Id.* at 265).

On August 18, 2003, four weeks after his surgery, Shawn Palmer, D.O., Plaintiff's treating physician, noted that Plaintiff was "progressing wonderfully"; he walked with slight antalgia, but was no longer using his cane and did not request pain medication. (R. at 232). Dr. Palmer placed him on a permanent "light work restriction." (*Id.*). On December 29, 2003, Plaintiff had flexion of 130 degrees in his left knee. (*Id.* at 229). While Plaintiff complained of pain, Dr. Palmer found nothing on a clinical examination to identify the source of the pain. (*Id.*). Dr. Palmer concluded that Plaintiff's antalgic gain was "exaggerated," and questioned whether Plaintiff was exhibiting "narcotic-seeking" behavior. (*Id.*).

On January 12, 2004, Mitchell B. Sheinkop, M.D, evaluated Plaintiff for Zurich Insurance. (R. at 782–83). Dr. Sheinkop found marked, painful crepitation between 35 and 70 degrees of motion whenever Plaintiff flexes or extends his knee. (*Id.*). The knee was well aligned and positioned. (*Id.* at 783). Dr. Sheinkop opined that Plaintiff would not regain functional capacity unless a revision procedure was completed with resurfacing of the patella. (*Id.*). He concluded that Plaintiff could return to gainful employment after the patella was resurfaced. (*Id.*).

On July 19, 2004, an examination found no pain with movement and flexion of 110 degrees in the left knee. (R. at 889–91). On September 29, 2004, Plaintiff reported steady improvement in his left knee with physical therapy. (*Id.* at 899). A functional capacity assessment performed on June 7, 2005, concluded that Plaintiff

could perform sedentary/light work, despite exhibiting "submaximal effort" during the examination. (*Id.* at 962).

On February 16, 2007, John Hassinger, M.D., a DDS consulting physician, examined the record and completed a physical RFC assessment. (R. at 856–63). Dr. Hassinger concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours. (*Id.* 857). Dr. Hassinger further opined that Plaintiff was limited to occasionally climbing ramps and stairs, never climbing ladders, ropes or scaffolds, occasionally kneeling and crouching, and never crawling. (*Id.* at 858). Dr. Hassinger found Plaintiff only partially credible, because the severity alleged by Plaintiff was not supported by the record evidence. (*Id.* at 861).

## V. DISCUSSION

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ's determination at step three was erroneous; (2) the ALJ's credibility determination was patently wrong; and (3) the ALJ's RFC determination was erroneous. (Mot. 1, 4–12). The Court addresses each argument in turn.

### A. Plaintiff Does Not Meet the Criteria for Listings 1.02 or 1.03

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (R. at 17). Specifically, that ALJ concluded:

> The undersigned assessed [Plaintiff's] left lower extremity impairments under § 1.00 *Musculoskeletal System*, Appendix 1. However, the medical evidence falls short of the criteria of the section, and no medi-

> cal source has mentioned findings equivalent in severity to the criteria
> of any listed impairment, individually or in combination.

(*Id.*). Plaintiff challenges the validity of the ALJ's determination, arguing that he lacks the ability to ambulate effectively. (Mot. 9). He contends that he meets the requirements of Listings 1.02 and 1.03. The Court disagrees.

Plaintiff has failed to meet his burden to demonstrate that his impairments satisfy all the requirements of either Listing 1.02 or 1.03. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). The medical evidence supports the ALJ's determination. Both Listing 1.02, *Major Dysfunction of a Joint*, and Listing 1.03, *Reconstructive Surgery*, require the inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02–1.03. The regulations define "inability to ambulate effectively" as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Thus, ineffective ambulation means "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* (citation omitted).

While the ALJ accommodated Plaintiff's exertional limitations by including the use of crutches in his RFC (R. at 17), Plaintiff has not demonstrated an inability

ambulate effectively as contemplated by the regulations. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4) ("The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented."). Indeed, the medical evidence indicates otherwise. (*See*, *e.g.*, R. at 254 (within a month of total knee replacement surgery, Plaintiff able to ambulate effectively without crutches), 251 (with physical therapy, gait and range of motion improved), 230 (able to ambulate without cane or crutch), 899 (gait improving and able to ambulate without cane or crutch), 232 (although Plaintiff walks with slight antalgia, he is able to ambulate without cane and is capable of light work)). And the VE testified that Plaintiff's use of crutches would not preclude him from an ability to perform sedentary work. (*Id.* at 61–62). In sum, Plaintiff has not met his burden of demonstrating that he meets all of the criteria for Listings 1.02 or 1.03. *See Ribaudo*, 458 F.3d at 583.

**B. Substantial Evidence Supports the ALJ's Credibility Determination**

Plaintiff states that he is unable to work because he cannot stand or sit for a long time and must use a cane to ambulate. (R. at 183). At the hearing, Plaintiff testified to being in near constant pain, which feels like a knife sticking into him. (*Id.* at 39, 41). He also testified that his leg "is just purple, and it's cold." (*Id.* at 45). Because of pain in his back and hip, he occasionally needs to use a walker to ambulate. (*Id.* at 46–47).

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 4–8). He asserts that the ALJ's decision failed to assess all available information about his symptoms and their effects. (*Id.* 5).

Specifically, Plaintiff argues that the ALJ's credibility determination was meaningless boilerplate, did not fully appreciate Plaintiff's pain, and failed to determine why Plaintiff missed his physical therapy appointments. (*Id.* 5–8).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms. Social Security Ruling (SSR)[7] 96-7p, at *2; *see* 20 C.F.R. § 404.1529(b). "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(c). In determining credibility "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (cita-

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

tions omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

### *1. Boilerplate Language*

Plaintiff contends that the ALJ used meaningless boilerplate language to discredit his statements, which resulted in result-oriented decision making. (Mot. 11). In his decision, the ALJ stated in part:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 18). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). The ALJ did that here.

In his decision, the ALJ further stated:

> [Plaintiff] also cancelled or failed to show up for physical therapy appointments on a number of occasions and was discharged from therapy in August 2003 from one clinic. [Plaintiff] started therapy sessions at a different clinic around that time, however, after attending five sessions, he had no more contact with the clinic and did not schedule additional appointments. This suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal.
>
> The record includes statements by doctors suggesting [Plaintiff] was engaging in possible exaggeration of symptoms and limitations. [Plaintiff's] therapist noted at one point that he "exhibited excessive pain

mannerisms" during performance range of motion exercises. The treating physician noted that [Plaintiff] had "a very exaggerated antalgic gait, and I question a narcotic-seeking behavior, as that seems to be most of the focus of the conversation for both he and his wife." The record also indicates that [Plaintiff's] treating physician, Dr. Shawn Palmer D.O. noted that [Plaintiff] was obtaining narcotic prescriptions from several different physicians at several different pharmacies. Records from a different medical provider also indicate that [Plaintiff] had received narcotic prescriptions from different physicians and that the pharmacy had some concerns about prescription being altered. These incidents do not lend great credibility to [Plaintiff's] allegations of disabling pain or impossibility to perform any type of work. Although the inconsistent information provided by [Plaintiff] may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by [Plaintiff] generally may not be entirely reliable.

(R. at 19) (citations omitted). These statements allow the Court to sufficiently analyze why the ALJ concluded that Plaintiff was not fully credible. *See Pepper*, 712 F.3d at 368.

### 2. *The ALJ Provided Specific Reasons for His Credibility Finding*

Plaintiff contends that the ALJ failed to fully consider his allegations of debilitating pain. (Mot. 7–8). On the contrary, the ALJ acknowledged Plaintiff's pain numerous times in his decision. (R. at 16, 18–20). The ALJ also gave significant weight to the opinion of the DDS consultant, who took Plaintiff's allegations of pain into account in making his RFC assessment. (*Id.* at 20, 857–58). And partly due to Plaintiff's testimony, the ALJ further decreased the DDS consultant's assessment to occasionally lifting or carrying 10 pounds and frequently lifting or carrying less than 10 pounds, along with the use of crutches for ambulation, "to fully accommodate all possible limitations imposed by [Plaintiff's] physical impairments." (*Id.* at 20).

Nevertheless, the ALJ reasonably concluded that Plaintiff's symptoms were not as serious as Plaintiff alleged. The ALJ noted that several of Plaintiff's physicians concluded that he was exaggerating his symptoms. (*See* R. at 262 (observing that Plaintiff "exhibited excessive pain mannerisms"), 229 (finding no source for Plaintiff's alleged pain and concluding that Plaintiff "has a very exaggerated antalgic gait"); *accord id.* at 19). Plaintiff's treating physicians were also concerned that he was engaged in narcotic-seeking behavior. (*See id.* at 229 (questioning Plaintiff's "narcotic-seeking behavior, as that seems to be most of the focus of the conversation for both he and his wife"), 907 (observing that pharmacy believed Plaintiff may be altering prescription form), 905 (concern that Plaintiff was filling prescriptions from multiple sources), 508 (same), 534 (same); *accord id.* at 19). The ALJ also noted that Plaintiff failed to attend physical therapy sessions despite the fact that they alleviated his symptoms. (*Id.* at 19; *see id.* at 265). Indeed, Plaintiff was discharged from physical therapy after failing to attend two sessions and not bothering to call to re-schedule. (*Id.* at 252). He later started therapy with a different therapist, but after attending five sessions, he failed to continue without explanation. (*Id.* at 250). These are all legitimate reasons for the ALJ to discount Plaintiff's credibility. *See Johnson*, 449 F.3d at 805 ("[T]he administrative law judge was not obliged to believe all her testimony. Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case.").

Plaintiff argues that "his alleged narcotic-seeking behavior could have easily . . . been interpreted as related to his need to alleviate his pain rather than to support a habit." (Mot. 7). But the ALJ was not discounting Plaintiff's credibility merely because he was seeking pain medications. Rather, the ALJ reasonably found that Plaintiff's underhanded methods for securing additional medication evinced general untrustworthiness. (R. at 19) ("Although the inconsistent information provided by [Plaintiff] may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by [Plaintiff] generally may not be entirely reliable.").

Plaintiff also contends that it was the ALJ's responsibility to determine why he stopped attending physical therapy. (Mot. 8). But Plaintiff makes no attempt to explain why he cancelled or failed to show up for his therapy sessions. *See Shinseki v. Sanders*, 556 U.S. 396, 399–413 2009 (party seeking to overturn an agency's administrative decision generally bears burden of demonstrating how any error would have made a difference to his claim). And at the hearing, he admitted that he was simply "tired of going to therapy." (R. at 38).

In sum, while Plaintiff has demonstrated certain disabling impediments, the ALJ properly concluded that "the limitations alleged are more restrictive than those supported by the objective medical evidence." (R. at 20). The Court finds that the ALJ's credibility determination was not "patently wrong." *See Craft*, 539 F.3d at 678. The finding was supported by substantial evidence and was specific enough for

the Court to understand the ALJ's reasoning. *See Moss*, 555 F.3d at 561; *Skinner*, 478 F.3d at 845.

## C. Substantial Evidence Supports the ALJ's Determination that Plaintiff Can Perform a Limited Range of Sedentary Work

The ALJ determined that Plaintiff has arthritis of the left knee and status post total left knee replacement. (R. at 16). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that as of the date last insured, Plaintiff had the RFC to perform sedentary work,[8] but could occasionally lift, carry, push or pull only 10 pounds and frequently less than 10 pounds; stand or walk for a total of at least 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; only occasionally climb ramps and stairs and kneel; never climb ladders, ropes or scaffolds or crawl; and needs crutches to ambulate. (*Id.* at 13). Plaintiff argues that the ALJ erred in this determination by failing to perform a functional analysis or delineating his maximum physical work-related capabilities in light of the exertional limitations documented in the record. (Mot. 9–10). In particular, Plaintiff asserts that the ALJ failed to take into consideration the limiting effects of his pain. (*Id.* 11–12).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do de-

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

spite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Plaintiff's testimony. The relevant medical evidence consistently assessed Plaintiff as being able to perform at least sedentary work. (*See* R. at 232 (Dr. Palmer opining in August 2003 that Plaintiff restricted to light work), 961–62 (functional capacity evaluation in June 2005 placed Plaintiff at a sedentary/light demand level, despite his "submaximal effort" during the evaluation); *see also id.* at 857 (DDS consultant concluding that Plaintiff capa-

ble of light work)). Moreover, physical examinations performed throughout the relevant time period support the ALJ's RFC assessment. (*See id.* at 1072 (Plaintiff able to flex his left knee through 130 degrees and had full extension in October 2002), (Plaintiff able to flex his knee through 115 degrees in July 2003), 232 & 254 (Plaintiff walked with slight antalgia, but able to ambulate without assistive devices in August 2003), 229 (Plaintiff able to flex knee to 130 degrees in December 2003), 889–91 (Plaintiff had no pain with movement and flexion of 110 degrees)).

The ALJ's RFC determination also took into account those portions of Plaintiff's testimony he found credible. Plaintiff testified that he is in near constant, substantial pain and occasionally uses a walker to ambulate, and frequently changes position. (R. at 39, 41, 45–47). Based on this testimony and the medical evidence, the ALJ limited Plaintiff to sedentary work, which requires lifting only 10 pounds, and allowed him to sit or stand at will. (*Id.* at 13); see 20 C.F.R. § 404.1657(a). Indeed, Plaintiff's testimony was critical in the ALJ's decision to reject the evidence that Plaintiff was capable of light work. (R. at 20) (decreasing Dr. Hessinger's physical RFC evaluation "to occasionally lifting and/or carrying 10 pounds and frequently lifting and/or carrying less than 10 pounds and the use of crutches for ambulation to fully accommodate all possible limitations imposed by [Plaintiff's] physical impairments").

Nevertheless, Plaintiff complains that the ALJ did not "factor[] into consideration the relation of [his] pain and its limiting effects upon him." (Mot. 11). On the contrary, because the ALJ found Plaintiff's allegations of pain partially credible, he

decreased Dr. Hessinger's evaluation and accommodated Plaintiff's crutches in formulating Plaintiff's RFC.[9] And, as discussed above, the ALJ properly found Plaintiff's allegations of pain only partially credible.

Finally, Plaintiff argues that the ALJ did not take proper consideration of Dr. Sheinkop's opinion that Plaintiff "had reached maximum medical improvement and that he would not benefit from further treatment except for palliative relief of pain." (Mot. 11; *see* R. at 683–84). But as the ALJ noted, Dr. Sheinkop's opinion neither posits an RFC nor concludes that Plaintiff is more limited than found by the ALJ. (R. at 20). Thus, Dr. Sheinkop's evaluation that Plaintiff had reached "maximum medical improvement" is not at odds with the ALJ's RFC.

In sum, the ALJ fulfilled his responsibility to determine Plaintiff's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case), *5 (The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could

---

[9] Plaintiff contends that the ALJ did not include Plaintiff's need for crutches in the hypotheticals posed to the VE. (Mot. 12). But the ALJ clearly stated in his hypothetical that the person "needs crutches to walk." (R. at 61). And the VE dispelled any doubt whether the crutches were considered by affirmatively responding to Plaintiff's counsel's question whether jobs "exist in significant numbers, even for somebody who's, who requires crutches to walk." (*Id.* at 62). Thus, the ALJ properly rejected Dr. Krieger's opinion that Plaintiff's crutches prevented him from gainful employment. (*Id.* at 20 (Dr. Krieger "opines that [Plaintiff] could not handle any work, but he based his assessment on the fact that [Plaintiff] is either on one or two crutches, which would not be an impediment for a sedentary occupation")) (citation omitted).

help the [ALJ] determine the most reasonable findings in light of all the evidence."). He properly weighed the various physician's opinions, and his decision to give the greatest weight to Dr. Hessinger's opinion was supported by substantial evidence, including Plaintiff's testimony. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (ALJ determines how much weight to give various medical opinions, which the Court will uphold if supported by substantial evidence.).

The Court finds that the ALJ did not err in his determination of Plaintiff's RFC. There is no support for Plaintiff's contention that the ALJ ignored contrary evidence. Instead, the ALJ carefully analyzed the evidence and Plaintiff's testimony to arrive at the maximum that Plaintiff could still do despite his physical limitations. *Craft*, 539 F.3d at 675–76. In sum, substantial evidence supports the ALJ's determination that Plaintiff could perform a limited range of sedentary work.

## V. CONCLUSION

For the reasons stated above Plaintiff's Motion to Reverse the Final Decision of the Acting Commissioner of Social Security [34] is DENIED. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R :

Dated: June 19, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge